Get a Document - by Citation - 2004 U.S. Dist. LEXIS 2677                    Page 1 of 18

Case 1:07-cv-07029    Document 18-5    Filed 03/27/2008    Page 1 of 18

*2004 U.S. Dist. LEXIS 2677, **

MEDLINE INDUSTRIES, INC., Plaintiff, v. MAERSK MEDICAL LIMITED, GILTECH LIMITED, and TYCO HEATHCARE GROUP, L.P., Defendants.

Case Number: 02 C 2805

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

2004 U.S. Dist. LEXIS 2677

February 23, 2004, Decided
February 24, 2004, Docketed

**PRIOR HISTORY:** Medline Indus., Inc. v. Maersk Med., Ltd., 230 F. Supp. 2d 857, 2002 U.S. Dist. LEXIS 22244 (N.D. Ill., 2002)

**DISPOSITION:  [*1]**  Plaintiff's motion for summary judgment denied. Defendants' motions for summary judgment granted. Plaintiff's motion for injunctive relief denied. Court struck parties' motions in limine.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff healthcare supply distributor sued defendants, a single-use medical device manufacturer, a medical technologies designer, and a medical product seller, seeking a declaratory judgment, and alleging breach of a distribution agreement, breach of its third-party rights, fraudulent inducement, fraudulent misrepresentation, and tortious interference with a contract. The parties cross-moved for summary judgment.

**OVERVIEW:** The manufacturer claimed, inter alia, that its patent license agreement amendments with the designer did not breach its distribution agreement with the distributor. The court initially declined to exercise jurisdiction over the distributor's declaratory judgment claim, and held that the manufacturer did not breach the distribution agreement by agreeing to patent license amendments with the designer as the representation of exclusivity in the distribution agreement was limited to the supply of the raw material from the designer which the manufacturer continued to receive. The court then held that the distributor had no third party rights under the patent license agreement, and that the distributor failed to establish that the manufacturer made a misrepresentation of material fact in the distribution agreement knowing that the statement was false. The court further held that the distributor failed to establish that the designer made a false statement of a material fact in letters to the distributor believing or knowing it was false, and that the distributor's tortious interference claims against the designer and seller failed due to their lack of intent and no breach of contract.

**OUTCOME:** Summary judgment was granted for the manufacturer, the designer, and the seller. The distributor's motion for summary judgment was denied.

**CORE TERMS:** licence, patent, summary judgment, tortious interference, trademark, technology, wound, dressing, material fact, declaratory judgment, inducement, woundcare, breach of contract, intentionally, manufacture, powder, raw material, fraudulent, induce, patent rights, entirety, induced, fibre, fraudulent misrepresentation, genuine issue, false statement, choice-of-law, contractual, sublicence, silver

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 2677    Page 2 of 18

Case 1:07-cv-07029    Document 18-5    Filed 03/27/2008    Page 2 of 18

**LEXISNEXIS(R) HEADNOTES**

Civil Procedure > Summary Judgment > Supporting Materials > General Overview
HN1 The facts in the parties' U.S. Dist. Ct., N.D. Ill., E.D., R. 56.1 statements that are not controverted are deemed admitted.

Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview
Civil Procedure > Federal & State Interrelationships > Choice of Law > General Overview
Civil Procedure > Federal & State Interrelationships > Erie Doctrine
HN2 Before evaluating the merits of a plaintiff's claims, the court must determine what substantive law applies to each claim in a diversity jurisdiction lawsuit. Under the Erie doctrine, a federal court exercising diversity jurisdiction must apply the choice-of-law rules of the state in which it sits.

Contracts Law > Contract Conditions & Provisions > Forum Selection Clauses
Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview
HN3 Under Illinois law, a court will apply a contract's choice-of-law clause to disputes that arise from that contract, if the contract is valid.

Civil Procedure > Federal & State Interrelationships > Choice of Law > General Overview
Civil Procedure > Federal & State Interrelationships > Erie Doctrine
HN4 Where neither party argues that the forum state's choice of law rules require the court to apply the substantive law of another state, the court should apply the forum state's substantive law.

Civil Procedure > Discovery > Methods > General Overview
Civil Procedure > Summary Judgment > Standards > Genuine Disputes
Civil Procedure > Summary Judgment > Standards > Materiality
HN5 Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

Civil Procedure > Summary Judgment > Standards > Genuine Disputes
Civil Procedure > Summary Judgment > Standards > Materiality
HN6 On a motion for summary judgment, a genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-movant.

Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview
Civil Procedure > Summary Judgment > Standards > Genuine Disputes
HN7 On a motion for summary judgment, the burden is on the moving party to show that no genuine issues of material fact exist and the non-moving party must set forth specific facts showing that a genuine issue for trial does exist.

Civil Procedure > Declaratory Judgment Actions > General Overview
HN8 See 28 U.S.C.S. § 2201(a).

Civil Procedure > Declaratory Judgment Actions > Federal Judgments > Discretion
HN9 Declaratory judgments permit the prompt determination of actual controversies and establish the legal rights and obligations governing the litigants' future relationships. The Declaratory Judgment Act grants federal courts unique and substantial discretion in deciding whether to declare the litigants' rights.

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 2677

Case 1:07-cv-07029    Document 18-5    Filed 03/27/2008    Page 3 of 18

Page 3 of 18

Civil Procedure > Declaratory Judgment Actions > Federal Judgments > General Overview
Civil Procedure > Judgments > Preclusion & Effect of Judgments > Res Judicata

HN10 To determine if declaratory relief is appropriate, the United States Court of Appeals for the Seventh Circuit has set forth the following considerations: (1) whether declaratory judgment would settle the controversy; (2) whether declaratory judgment would serve a useful purpose in clarifying the parties' legal relationships; (3) whether declaratory judgment is being used for the purpose of procedural fencing or to provide an arena for a race for res judicata; (4) whether the declaratory action would increase friction between federal and state courts; and (5) whether an alternative remedy is better or more effective.

Contracts Law > Contract Interpretation > General Overview

HN11 Construction of contracts under English law is an issue of law. When determining the meaning and legal effect of a contract, the words in the contract are given their plain and ordinary meaning. The objective of contractual construction is to determine the parties' intent. In other words, the court must discern the meaning which the document would convey to a reasonable person having all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract.

Contracts Law > Contract Interpretation > General Overview

HN12 For contract interpretation purposes, where the language in a contract is clear, it must be given its plain and ordinary meaning.

Contracts Law > Contract Interpretation > General Overview

HN13 Without a clear expression of intent by the parties, the court must avoid such an unreasonable result in construing the contract. The fact that a particular construction leads to a very unreasonable result must be a relevant consideration. The more unreasonable the result the more unlikely it is that the parties can have intended it, and if they do intend it the more necessary it is that they shall make their intention abundantly clear.

Civil Procedure > Summary Judgment > Standards > Appropriateness
Contracts Law > Contract Interpretation > General Overview

HN14 Construction of an unambiguous contract is question of law appropriate at summary judgment.

Contracts Law > Third Parties > Beneficiaries > Claims & Enforcement

HN15 Third-party rights are recognized under Scottish law and referred to as jus quaesitum tertio. To create a jus quaesitum tertio, Scottish law requires: (1) a contract; (2) an intention, express or implied, in that contract to benefit a third-party; (3) the identification of the third-party; and (4) delivery or the equivalent to the third-party.

Contracts Law > Third Parties > Beneficiaries > Claims & Enforcement

HN16 For purposes of third-party rights under Scottish law, in order to create a jus quaesitum tertio, the tertius must be identified in the contract at least as a class and the contracting party's intention to benefit the third-party must be expressed therein or clearly implied from the terms thereof. The fact that a third-party is interested in the fulfillment of obligations undertaken by one contracting party is not enough to give the third-party a title to sue on the contract to which he is not a party. In essence, the court must consider whether the provision of the contract confers some benefit on the tertius, i.e., third party, and whether it is evident that the contracting parties intended to give the tertius a title to sue upon the

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 2677 Page 4 of 18

Case 1:07-cv-07029 Document 18-5 Filed 03/27/2008 Page 4 of 18

contractual provision at issue.

Torts > Business Torts > Fraud & Misrepresentation > General Overview
HN17 ⬇ The elements of fraudulent inducement under English law are: (1) misrepresentation of material fact; (2) made with knowledge that it is false and with the intent to induce the party to act upon it; (3) which is reasonably relied upon by the other party; and (4) as a result of which the party suffers injury. Because of the serious nature of fraud allegations, the standard of proof that is applied under these circumstances is a high one.

Torts > Business Torts > Fraud & Misrepresentation > General Overview
HN18 ⬇ For purposes of claim of fraudulent inducement under English law, to prevent a false statement from being fraudulent, there must be an honest belief in its truth.

Evidence > Procedural Considerations > Burdens of Proof > Clear & Convincing Proof
Torts > Business Torts > Fraud & Misrepresentation > General Overview
HN19 ⬇ To establish a claim of fraudulent misrepresentation under Illinois law, a plaintiff must show the following elements by clear and convincing evidence: (1) a false statement of material fact; (2) the defendant believed or knew the statement was false; (3) the defendant intended to induce plaintiff to act; (4) the plaintiff relied on the truth of the statement; and (5) the plaintiff suffered an injury as a result of her reliance.

Torts > Business Torts > Fraud & Misrepresentation > General Overview
HN20 ⬇ Under Illinois law, an action for fraudulent misrepresentation requires that the maker of a representation knew that the representation was false or that he made the representation with reckless disregard for its truth or falsity.

Torts > Business Torts > Fraud & Misrepresentation > General Overview
HN21 ⬇ Fraud in the sense of deliberate deceit cannot be inferred from falsity alone.

Contracts Law > Breach > General Overview
Torts > Business Torts > Commercial Interference > Contracts > Elements
HN22 ⬇ To establish tortious interference with contract, a plaintiff must plead and prove the following elements: (1) the existence of a valid and enforceable contract; (2) the defendant's awareness of the contractual relationship; (3) the defendant's intentional and unjustified, i.e., malicious, inducement of the breach of the contract; (4) a subsequent breach caused by defendant's wrongful conduct; and (5) damages.

Contracts Law > Breach > General Overview
Torts > Business Torts > Commercial Interference > Contracts > Elements
Torts > Intentional Torts > Defenses > Intent
HN23 ⬇ In the context of the third element for tortious interference with contract, a showing of ill will, hostility, or intent to injure is not required. Instead, element three requires a showing that the defendant acted intentionally and without justification to induce the breach of contract.

Torts > Business Torts > Commercial Interference > Contracts > General Overview
Torts > Intentional Torts > Defenses > Intent
HN24 ⬇ One who intentionally and improperly interferes with the performance of a contract between another and a third person by inducing or otherwise causing the third person to not perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 2677    Page 5 of 18

Case 1:07-cv-07029    Document 18-5    Filed 03/27/2008    Page 5 of 18

perform the contract. This applies to any intentional causation whether by inducement or otherwise. The essential thing is the intent to cause the result. If the actor does not have this intent, his conduct does not subject him to liability under this rule even if it has the unintended effect of deterring the third person from dealing with the other.

Contracts Law > Breach > General Overview
Contracts Law > Third Parties > General Overview
Torts > Business Torts > Commercial Interference > Contracts > General Overview

HN25 It is well established that one who intentionally and without justification induces another to breach his contract with a third party will be liable to the other for the pecuniary loss resulting from the failure of the third person to perform the contract. Therefore, while it is true that Illinois law does not require a showing of ill will, hostility, or an intent to injure, a plaintiff must establish that the defendant acted intentionally and without justification in inducing or causing a breach of contract.

Contracts Law > Breach > General Overview
Torts > Business Torts > Commercial Interference > Contracts > Elements

HN26 The fourth element of tortious interference of contract under Illinois law is that a contract has been breached.

Civil Procedure > Summary Judgment > Appellate Review > General Overview
Civil Procedure > Summary Judgment > Opposition > General Overview
Civil Procedure > Summary Judgment > Standards > General Overview

HN27 It is not the reviewing court's duty to scour the record in search of evidence to defeat a motion for summary judgment.

**COUNSEL:** For Medline Industries, Inc, PLAINTIFF: Robert Leslie Byman, Anton Ronald Valukas, Matthew George Borgula, Daniel Shim, Darren J Schmidt, Jenner & Block, Chicago, IL USA.

For Maersk Medical Limited, DEFENDANT: J Patrick Herald, Thomas Anthony Doyle, Matthew G Allison, Erin Mary McCloskey, Baker & McKenzie, Chicago, IL USA.

For Giltech Limited, DEFENDANT: John J Arado, Gary R Gillen, Joshua Lee Smith, Wildman, Harrold, Allen & Dixon, Chicago, IL USA.

For Doe Corporation AKA Doe Corp, DEFENDANT: James A Shimota, Kirkland & Klimek, Ltd, Russell Evan Levine, Walter Robert Lancaster, Marcus Edward Sernel, Daniel Patrick Williams, Kirkland & Ellis LLP, Chicago, IL USA.

**JUDGES:** Blanche M. Manning, United States District Court Judge.

**OPINION BY:** Blanche M. Manning

**OPINION**

**MEMORANDUM OPINION AND ORDER**

After the court granted in part and denied in part defendant Maersk Medical Limited's motion to dismiss **[*2]** the Complaint, the plaintiff, Medline Industries, Inc. filed an eight-count, Second Amended Complaint with this court. Presently before the court are: (1) Medline's

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 2677

Case 1:07-cv-07029 Document 18-5 Filed 03/27/2008 Page 6 of 18

Page 6 of 18

motion for summary judgment on Count I; (2) Maersk's motion for summary judgment on Counts I, II, III, and V; (3) defendant Giltech Limited's motion for summary judgment on Counts I, IV, VI, and VII; and (4) defendant Tyco Healthcare Group, L.P.'s motion for summary judgment on Counts I and VIII. For the following reasons, the court grants: (1) Maersk's motion for summary judgment on Counts I, II, III, and V; (2) Giltech's motion for summary judgment as to Counts I, IV, VI, and VII; and (3) Tyco's motion for summary judgment on Counts I and VIII. Accordingly, the court denies Medline's motion for summary judgment as to Count I and dismisses this action in its entirety.

## I. BACKGROUND [1]

**FOOTNOTES**

1 The facts in the "Background" section are derived from the parties' Local Rule 56.1 statements and other pleadings. HN1 The facts in the parties' Rule 56.1 statements that are not controverted are deemed admitted. *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

[*3] **A. The Parties**

Plaintiff Medline Industries, Inc., a privately-held Illinois corporation, is a manufacturer and distributor of healthcare supplies and services. Defendant Maersk Medical Limited is a corporation organized under the laws of the United Kingdom with its principal place of business in England. Maersk participates in the manufacture and international sale of single-use medical devices. Defendant Giltech Limited is a Scottish corporation engaged in the design, development, and manufacture of technologies incorporated into other companies' medical devices, which are sold by Giltech's licences [2] throughout global markets, including the United States. Defendant Tyco Healthcare Group, L.P. is a Delaware limited partnership that sells medical products throughout the world. At issue are the parties' respective rights to woundcare products sold under the trademark "Arglaes".

**FOOTNOTES**

2 Due to the repeated use of the noun "licence" in the contracts at issue, the court will employ the British variant of "license" for the sake of clarity and consistency. *See* The American Heritage* Dictionary of the English Language (4th Ed. 2000).

[*4] **B. Giltech-Maersk Relationship**

Giltech invented, patented, and trademarked the "Arglaes" products which utilize controlled-release silver technology. Giltech and Maersk entered into a series of agreements regarding the "Arglaes" products, including a Patent Licence Agreement, a Trademark Licence Agreement, and two supply agreements. Specifically, on July 28, 1994, Giltech and Maersk entered into the Patent Licence Agreement granting Maersk "an exclusive licence under the Patent Rights in the Field to make, have made, use, import, sell and otherwise dispose of Licenced Products" and "an exclusive licence to use and employ the Know-How in the Field for the manufacture, use, sale and other disposal of Licenced Products." The "Field" was defined as "wound management of, but not limited to, wounds of the following origins, surgical intervention, intravenous puncture, catheterisation, chronic deterioration, acute onset, burns, ostomy and accident or emergency". "Licenced Products" was defined as "any products for use in the Field which ... fall within the scope of any claim of any of the Patent Rights." The Trademark Licence Agreement grants Maersk the exclusive licence to use the [*5] trademark "Arglaes" as to the "Products" within the Field of wound management and provides for the

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 2677

Case 1:07-cv-07029    Document 18-5    Filed 03/27/2008    Page 7 of 18

Page 7 of 18

granting of trademark sublicences. Giltech and Maersk also entered into two supply agreements in which Giltech agreed to exclusively supply to Maersk topical powder and polyurethane film dressing containing Arglaes silver release polymer.

**C. Maersk-Medline Distribution Agreement**

On December 1, 1997, Maersk and Medline entered into an agreement giving Medline exclusive distribution rights and a trademark sublicence ("Distribution Agreement"). Article 3 (a) of the Distribution Agreement states in pertinent part: "[Maersk] represents that it holds an exclusive Supply Agreement for the supply to [Maersk] of the raw material necessary for the manufacturer [sic] by [Maersk] of Products and that said Supply Agreement is for the total duration of this Agreement and shall be maintained in full validity." In Article 3(b), "[Maersk] hereby represents that it has authority to grant and grants to Medline and Medline accepts an exclusive licence with a right to sub-licence to any Affiliate to use [Maersk's] rights under the trade mark agreement held by [Maersk] from Giltech Limited **[*6]** for the Products in the Territory."

"Products" is defined in Article 2 of the Distribution Agreement as "any and all Products listed in Annex A, together with any new wound management product sold under the trademark Arglaes." Listed in Annex A are five product formats, including Arglaes Film Dressing, Arglaes Island Dressing, Arglaes Powder Dressing, Arglaes/Alginate Powder Dressing, Arglaes/Alginate Mixed Fibre Dressing. Annex A also states: "The Product is a controlled release silver bearing woundcare dressing in film, powder or fibre form, or, any of the foregoing in any combination, or in combination with alginate fibre or alginate powder."

If, in the future, Maersk were to manufacture new Arglaes products, Article 6(a) of the Distribution Agreement grants Medline a right of first refusal -- "If [Maersk] manufactures any extension to the range of wound management Products Trademarked Arglaes, as detailed in Annex A, such product may be added in Annex A in accordance with Article 6(b) at no cost to Medline."

Article 21(d)(i) of the Distribution Agreement required Maersk to provide Medline with a written legal opinion from Giltech that the representations made by Maersk in **[*7]** Articles 3 (a) and 3(b) of the Distribution Agreement were correct. Giltech's legal representatives provided a letter stating "Giltech have granted to [Maersk] an exclusive supply agreement whereby Giltech have agreed to supply only to [Maersk] Arglaes calcium phosphate glass and silver ("the Products") for use in wound management being management of wounds, including but not limited to wounds of the following origins; surgical intervention, intravenous puncture, catheterisation, chronic deterioration, acute onset, burns, ostomy and accident or emergency ("the Field")." In addition, the letter verified "[Maersk] are authorised to grant sub-licences in respect of the trademark Arglaes under the Trademark Licence granted by Giltech to [Maersk]." The letter also stated: "The rights granted to [Maersk] by Giltech in respect of Giltech's rights in the trademark Arglaes and in respect of Giltech's patents and know-how relative to the Products in the Field are granted on a world-wide basis." Finally, the letter provided that: "All the Agreements between Giltech and [Maersk] are enforceable according to their terms." Giltech gave the letter to Maersk which, in turn, gave the letter **[*8]** to Medline.

**D. Amendments to Giltech-Maersk Agreements**

Due to dissatisfaction with the royalties from Maersk, Giltech approached Maersk in 1999 for the return of certain patent rights. Giltech and Maersk amended the Patent Licence Agreement, and thus created a "ring fence" or the outer boundaries of the "Products" by deleting the words "any products" from Clause 1 and substituting specifications for the five listed products. These specifications included film dressings, UK topical powder, US topical powder, island dressing, and fibre/fibre dressings. Maersk and Giltech intended these five products to coincide with the five products listed in Annex A of the Distribution Agreement

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 2677    Page 8 of 18

Case 1:07-cv-07029    Document 18-5    Filed 03/27/2008    Page 8 of 18

between Maersk and Medline. In 2000, Giltech and Maersk renegotiated the specifications of the five products listed in the 1999 Amendment as they applied to the patent licence Giltech granted to Maersk.

### E. Giltech-Tyco Relationship

On October 15, 2001, Giltech entered into a licence and supply agreement with Tyco that granted Tyco a licence in certain patent rights owned by Giltech. The licence was exclusive for the field of wound dressings, except to the extent that the "ring fence" rights **[*9]** were carved out to respect those rights remaining with Maersk after the 1999 and 2000 Amendments to the Patent Licence Agreement. On November 20, 2002, Giltech and Tyco executed a purchase agreement which superseded the licence and supply agreement granting Tyco intellectual property relating to soluble biocompatible and biodegradable glass and polymer. The assigned intellectual property is free from any encumbrances of any kind except for the licences identified in Appendix F. Appendix F lists the Giltech-Maersk Patent Licence Agreement and the 1999 and 2000 Amendments. In the purchase agreement, "Giltech represents and warrants that the terms of this Agreement are not inconsistent with other contractual obligations Giltech may have, and that no assignment, sale, agreement or encumbrance has been, or will be made or entered into, which would conflict with this Agreement."

Because approval from the Food and Drug Administration ("FDA") is generally required before an anti-microbial woundcare product can be sold commercially, Tyco intends to seek FDA approval for a hydrocolloid-type product incorporating the Giltech silver-release technology. A hydrocolloid-type product is different **[*10]** from the product formats listed in Annex A of Medline and Maersk's Distribution Agreement. Tyco represents that it has no intention to develop any products that would fall within the "ring fence" specifications set forth in the Amendments to the Giltech-Maersk Patent Licence Agreement. To date, Tyco has not offered for sale any commercial products incorporating the Giltech silver-release technology.

### F. The Current Lawsuit

On February 13, 2002, Medline filed a six-count Complaint against Maersk, Giltech, and Tyco in the Circuit Court of Cook County. On April 18, 2002, Giltech and Maersk removed the action to this court based on diversity jurisdiction. Because there is complete diversity of citizenship and the requisite amount in controversy, the court has subject matter jurisdiction under 28 U.S.C. § 1332(a).

On November 14, 2002, the court granted in part and denied in part Maersk's motion to dismiss. *See Medline Indus. Inc. v. Maersk Med. Ltd.,* 230 F. Supp. 2d 857 (N.D.Ill. 2002). On February 25, 2003, Medline filed an eight-count Second Amended Complaint. Count I seeks a declaratory judgment against all defendants. Count II alleges **[*11]** a breach of the Distribution Agreement against Maersk. Counts III and IV allege a breach of Medline's third-party rights against Maersk and Giltech, respectively. Next, Count V alleges fraudulent inducement to enter into the Distribution Agreement against Maersk. The next count, Count VI, alleges fraudulent misrepresentation against Giltech. Finally, Counts VII and VIII allege tortious interference with contract against Giltech and Tyco, respectively.

### II. CHOICE-OF-LAW

<sup>HN2</sup> Before evaluating the merits, the court must determine what substantive law applies to each claim in this diversity jurisdiction lawsuit. Under the *Erie* doctrine, a federal court exercising diversity jurisdiction must apply the choice-of-law rules of the state in which it sits. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941); *FDIC v. Wabick,* 335 F.3d 620, 625 (7th Cir. 2003). Thus, this court, sitting in Illinois, will apply Illinois choice-of-law rules. This court has previously determined English law to be

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 2677										Page 9 of 18

Case 1:07-cv-07029    Document 18-5    Filed 03/27/2008    Page 9 of 18

the substantive law governing the breach of contract claim under Count II and the fraudulent inducement claim under Count V. *See Medline Indus. Inc.,* 230 F. Supp.2d at 862-63. **[*12]** Therefore, the court will apply English law to those claims and will conduct a choice-of-law analysis for the remaining substantive claims.

### A. Count III & IV -- Third-Party Rights under Patent Licence Agreement

Counts III and IV allege violations of Medline's third-party rights under the Patent Licence Agreement. The Patent Licence Agreement contains a choice-of-law clause which provides that the agreement is to be "construed and interpreted in accordance with, and governed by, the Law of Scotland." <sup>HN3</sup>Under Illinois law, a court will apply a contract's choice-of-law clause to disputes that arise from that contract, if the contract is valid. *See Kohler v. Leslie Hindman. Inc.,* 80 F.3d 1181, 1184-85 (7th Cir. 1996). The parties do not contest the validity of the Patent Licence Agreement and rely on Scottish law in their arguments. Therefore, the court will apply Scottish law to Medline's breach of third-party rights claims. *See American Home Assurance Co. v. Stone,* 61 F.3d 1321, 1324 (7th Cir. 1995) (court applied Illinois law where parties did not raise conflict of law issue and argued Illinois law).

### B. Count VI -- Fraudulent Misrepresentation

**[*13]** Although Medline cites to no substantive case law as to Count VI, Medline does not argue that Giltech's use of Illinois law in support of its motion for summary judgment is in error. <sup>HN4</sup>"Where neither party argues that the forum state's choice of law rules require the court to apply the substantive law of another state, the court should apply the forum state's substantive law." *Echo, Inc. v. Whitson Co.,* 52 F.3d 702, 707 (7th Cir. 1995). Therefore, the court will apply Illinois law to Count VI.

### C. Counts VII and VIII -- Tortious Interference of Contract

In Giltech and Medline's arguments regarding Count VII, both parties cite to Illinois law. In their arguments regarding Count VIII, Tyco and Medline cite to Illinois law as governing the tortious interference with contract claim. Because none of the parties argue that this court must apply the substantive law of another state, *see Echo,* 52 F.3d at 707, the court will apply Illinois law to Counts VII and VIII.

### III. DISCUSSION

### A. Summary Judgment Standard

<sup>HN5</sup>Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with **[*14]** the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). <sup>HN6</sup>A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). <sup>HN7</sup>The burden is on the moving party to show that no genuine issues of material fact exist and the non-moving party must set forth specific facts showing that a genuine issue for trial does exist. *See Celotex,* 477 U.S. at 322, 324.

### B. Count I -- Declaratory Judgment Claim

All parties have moved for summary judgment on Count I of the Second Amended Complaint. In Count I, Medline asks the court to declare: (1) the Distribution Agreement is valid and in full force and effect, granting Medline the exclusive rights to market, sell, and

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 2677

Case 1:07-cv-07029 Document 18-5 Filed 03/27/2008 Page 10 of 18

Page 10 of 18

distribute **[*15]** products employing Giltech technology within the North American market; (2) the Distribution Agreement is in full force and effect, granting Medline the exclusive right to the supply of Giltech's proprietary raw material for woundcare products within the North American market; (3) Giltech is estopped from denying that Maersk has an exclusive supply agreement for the supply of Giltech's proprietary raw material for woundcare products and that Maersk has the right to and has granted a valid sublicence to Medline for the North American market; and (4) the defendants have no right to modify the grant of rights to Medline in the Distribution Agreement and that any subsequent contractual arrangements between defendants, including, but not limited to the 1999 and 2000 Giltech-Maersk Amendments and the 2001 and 2002 Tyco-Giltech Agreements, were void *ab initio* insofar as they affect Medline's rights. Finally, Medline requests injunctive relief to enjoin the defendants from entering into competition in the North American market for any products for which Medline is entitled to exclusivity under the Distribution Agreement.

Section 2201(a) of the Declaratory Judgment Act ("the Act") states, **[*16]** in pertinent part, that *HN8* "in a case of actual controversy within its jurisdiction ... any court of the United States, upon filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." In other words, *HN9* declaratory judgments permit the prompt determination of actual controversies and establish the legal rights and obligations governing the litigants' future relationships. *See Hyatt Int'l Corp. v. Coco,* 302 F.3d 707, 711 (7th Cir. 2002). The Act grants federal courts unique and substantial discretion in deciding whether to declare the litigants' rights. *See Wilton v. Seven Falls Co.,* 515 U.S. 277, 286, 132 L. Ed. 2d 214, 115 S. Ct. 2137 (1995).

*HN10* To determine if declaratory relief is appropriate, the Seventh Circuit has set forth the following considerations: (1) whether declaratory judgment would settle the controversy; (2) whether declaratory judgment would serve a useful purpose in clarifying the parties' legal relationships; (3) whether declaratory judgment is being used for the purpose of "procedural fencing" or "to provide an arena for a race **[*17]** for res judicata"; (4) whether the declaratory action would increase friction between federal and state courts; and (5) whether an alternative remedy is better or more effective. *See Nucor Corp. v. Aceros y Maquilas de Occidente, S.A.,* 28 F.3d 572, 579 (7th Cir. 1994) (citing and quoting *Nationwide Mut. Fire Ins. Co. v. Willenbrink,* 924 F.2d 104, 105 (6th Cir. 1991)).

Here, a declaratory judgment would not settle the entire controversy. Medline has presented several substantive claims in addition to its declaratory judgment claim and alleges that these claims are dependent upon whether it receives relief in Count I. Specifically, if Medline is granted declaratory relief, Medline claims "that victory would obviate the need to continue with the prosecution of some of the remaining counts of the Second Amended Complaint." However, only Count II of Medline's complaint explicitly states it is contingent upon the denial of relief in Count I. Indeed, it is unclear whether the declaratory judgment would settle any of the remaining counts and the controversy as Medline contends.

Nevertheless, Medline has better and more effective remedies available via its substantive **[*18]** claims brought in its Second Amended Complaint. Medline's rights under the Distribution Agreement will be determined in the resolution of Count II and Medline's rights as a third-party beneficiary to the Giltech-Maersk Patent Licence Agreement will be determined in Counts III and IV. Finally, Tyco's involvement will be addressed in Count VIII. Because Medline's declaratory judgment claim will not resolve the entire controversy and the parties' legal relationships will be better resolved by the remaining substantive counts of the Second Amended Complaint, the court, it its discretion, declines to exercise its jurisdiction under the Declaratory Judgment Act. *See Wilton,* 515 U.S. at 286. Therefore, the court grants the defendants' motion for summary judgment as to Count I and denies Medline's request for injunctive relief.

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 2677    Page 11 of 18

Case 1:07-cv-07029    Document 18-5    Filed 03/27/2008    Page 11 of 18

### C. Count II - Breach of the Distribution Agreement Against Maersk

In Count II of the Second Amended Complaint, Medline alleges Maersk breached the Distribution Agreement "specifically Article 3, when it secretly agreed to the 1999 and 2000 Amendments of the Patent Licence Agreement, ceding back to Giltech a substantial portion of the exclusive **[*19]** rights previously granted to Medline." (Second Am. Compl. P 42). Medline also alleges that if this court does not grant the relief as requested in Count I, Maersk will be in breach of its representations of exclusivity. Essentially, Medline argues that at the time of contracting no one other than Maersk could use Giltech technology to make woundcare products and no one other than Medline could sell a Maersk woundcare product in the United States. Although it has no direct rights to the Giltech technology, Medline contends that it was assured it would not face competition from other Giltech technology products because only Maersk could make them. Medline relies upon the representations of exclusivity in Article 3(a) in support of its position.

Maersk, however, contends that Medline's breach of contract claim fails because Maersk ceded nothing back to Giltech that it had previously given to Medline. Maersk also argues that the 1999 and 2000 Amendments to the Patent Licence Agreement did not alter the terms of the supply agreements, and thus cannot have affected the truth or falsity of Maersk's representations made in Article 3(a) of the Distribution Agreement.

As discussed previously, **[*20]** Count II is governed by the choice of law clause in the Distribution Agreement selecting English law. HN11 Construction of contracts under English law is an issue of law. *See Reliance Indus Ltd. v. Enron Oil & Gas India Ltd.*, [2002] 1 Lloyd's Rep. 645 (Q.B.D.). When determining the meaning and legal effect of a contract, the words in the contract are given their plain and ordinary meaning. *See, e.g., Cooke & Arkwright v. Hadon*, [1987] 2 Lloyd's Rep. 579, 582 (C.A.); *see also Robertson & Thompson v. French*, [1803] 4 East 130, 135. The objective of contractual construction is to determine the parties' intent. *See Shogun Fin. Ltd. v. Hudson,* [2003] 3 W.L.R. 1371 (H.L.). In other words, the court must discern the "meaning which the document would convey to a reasonable person having all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract." *See Investors Comp. Scheme Ltd. v. West Bromwich Bldg. Soc'y,* [1998] 1 W.L.R. 896, 912-13 (H.L.).

At issue is the meaning of Maersk's representation of an exclusive supply agreement **[*21]** in Article 3(a) of the Distribution Agreement. Article 3(a) states:

> [Maersk] represents that it holds an exclusive Supply Agreement for the supply to [Maersk] of the raw material necessary for the manufacturer [sic] by [Maersk] of Products and that said Supply Agreement is for the total duration of this Agreement and shall be maintained in full validity. [Maersk] hereby grants to Medline and Medline accepts the exclusive right with a right to sub-licence to any Affiliate, to market, sell and distribute in the Territory Products manufactured by [Maersk]. Any sub-licence to an Affiliate shall terminate in the event that the sub-licencee ceases to be an Affiliate.

Maersk argues it represented that it had supply agreements that would enable it to manufacture the "Products"- defined by the Arglaes trademark-called for in the Distribution Agreement. Medline, however, argues that Maersk represented it had the right to grant to Medline the exclusive use in North America to all Giltech technology and proprietary raw material for woundcare products, not just the trademarked Arglaes products.

The disagreement between Medline and Maersk as to the meaning of Article **[*22]** 3(a) of the Distribution Agreement turns on the definition of "Products." Medline argues "Products" is defined by reference to Annex A of the Distribution Agreement, which states "the product is a controlled release silver bearing woundcare dressing in film, powder or fibre form, or, any of

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 2677    Page 12 of 18

Case 1:07-cv-07029    Document 18-5    Filed 03/27/2008    Page 12 of 18

the foregoing in any combination, or in combination with alginate fibre or alginate powder." Medline also relies on a letter submitted by Giltech in support of its interpretation of Article 3 (a). Under English law, however, if the parties' intentions are unequivocally expressed, courts should not construe the contract by reference to extrinsic materials. *See Cantrell v. Wright & Fuller, Ltd.,* [2003] EWHC 1545 (Q.B.D.). "This rule is the last vestige of the parole evidence rule which requires a document to stand on its own and not be glossed by extrinsic materials." *Id.* Even if this court were to find the parties' intentions ambiguous, thereby allowing the court to include the Giltech letter in the contract construction, Medline misquotes the language in the letter by omitting the term Arglaes which limits the definition of "Products" to the trademarked Arglaes products-- a definition that **[*23]** clearly contradicts the gravamen of Medline's argument.

Maersk, on the other hand, contends that Article 2 of the Distribution Agreement unequivocally defines "Products" as "any and all Products listed in Annex A, together with any new wound management product sold under the trademark Arglaes." Maersk emphasizes that all products listed in Annex A are "Arglaes" branded products and, under the Article 2 definition, any new products will also be Arglaes branded products.

Indeed, HN12 the language defining "Products" in Article 2 is clear, and thus must be given its plain and ordinary meaning. *See Cooke,* [1987] 2 Lloyd's Rep. at 582. The language of Article 2 combined with the listed products in Annex A, limits the definition of "Products" to Arglaes trademarked products. Medline's interpretation of the agreement would require this court to ignore the language referring to "any new wound management product sold under the trademark Arglaes" and the listed products in Annex A by focusing only on the description of the products in Annex A. Further, Medline's interpretation would grant much broader rights, unlimited by trademark, than the explicit language which the agreement **[*24]** contains. HN13 Without a clear expression of intent by the parties, the court must avoid such an unreasonable result in construing the contract. *See Sunport Shipping Ltd. v. Tryg-Baltica Int'l Ltd.,* [2003] 1 Lloyd's Rep. 138, 143 (C.A.) ("The fact that a particular construction leads to a very unreasonable result must be a relevant consideration. The more unreasonable the result the more unlikely it is that the parties can have intended it, and if they do intend it the more necessary it is that they shall make their intention abundantly clear"). Therefore, "Products" as defined by Article 2 of the Distribution Agreement is limited to Arglaes branded products.

As a result of the definition of "Products," the representation of exclusivity in Article 3(a) is limited to the supply of the raw material necessary for Maersk to manufacture Arglaes branded products. Maersk, and only Maersk, continues to receive from Giltech such raw material necessary for the manufacture by Maersk of the Products sold under the trademark Arglaes. Moreover, Medline has not faced competition within the Arglaes brand. In fact, Medline has admitted it is unaware of anyone else in the United States **[*25]** who is selling or claiming the rights to sell any silver-bearing woundcare products manufactured by Maersk or sold under the trademark Arglaes. (*See* Medline's Response to Giltech Limited's Rule 56.1 Statement, P 126). Thus, Maersk has done nothing to breach its representation made in Article 3(a).

In addition, the 1999 and 2000 Amendments to the Patent Licence Agreement did not change the terms of the supply agreements. Although the Amendments ceded back to Giltech certain patent rights, Medline has admitted it has no direct rights to the Giltech technology. Specifically, Medline admitted that "Maersk did not grant Medline a sublicence to any patent rights owned by Giltech. Pursuant to the Distribution Agreement, Medline did not receive any patent rights or any technology invented or developed by Giltech." (*See* Medline's Response to Giltech Limited's Rule 56.1 Statement, PP 108, 109). Further, Medline admitted "there is no provision in the distribution agreement which expressly prohibits Maersk from amending any of its agreements (including the Patent Licence Agreement) with Giltech." (*Id.* at P 128). Thus, the Amendments did not affect Medline's rights under the Distribution **[*26]** Agreement because Medline has no rights to Giltech's patents or technology in the first instance.

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 2677	Page 13 of 18

Case 1:07-cv-07029    Document 18-5    Filed 03/27/2008    Page 13 of 18

In sum, the Distribution Agreement gives Medline the right to distribute Maersk-produced, Arglaes-branded products. Accordingly, the court concludes that Maersk is entitled to judgment as a matter of law. *See Rizzo v. Pierce & Assocs.*, 351 F.3d 791, 793 (7th Cir. 2003) HN14(construction of unambiguous contract is question of law appropriate at summary judgment). The court grants Maersk's motion for summary judgment with respect to Count II.

### D. Count III - Breach of Medline's Third-Party Rights Against Maersk

In Count III, Medline alleges that it is a third-party beneficiary to the Giltech-Maersk Patent Licence Agreement and that Maersk breached Medline's rights under the agreement. Maersk contends that Medline has no third-party rights under the Patent Licence Agreement because the agreement does not identify or refer to Medline or any class to which it is a member, and the Patent Licence Agreement does not confer a right to sue upon any third-parties. Medline, however, claims that the terms of the Patent Licence Agreement referring to sublicences and subcontracts **[*27]** express an intention to benefit third-parties like Medline.

As discussed previously, the court will apply Scottish law to this claim. HN15 Third-party rights are recognized under Scottish law and referred to as *jus quaesitum tertio.* To create a *jus quaesitum tertio*, Scottish law requires: (1) a contract; (2) an intention, express or implied, in that contract to benefit a third-party; (3) the identification of the third-party; and (4) delivery or the equivalent to the third-party. *See* McBryde, The Law of Contract in Scotland § 10-08 (2d ed. 2001); *see, e.g., Scott Lithgow Ltd. v. GEC Elec. Projects Ltd.*, 1992 S.L.T. 244, 259-62 (O.H. 1989). HN16 "In order to create a *jus quaesitum tertio,* the tertius must be identified in the contract at least as a class and the contracting party's intention to benefit the third-party must be expressed therein or clearly implied from the terms thereof. The fact that a third-party is interested in the fulfilment of obligations undertaken by one contracting party is not enough to give the third-party a title to sue on the contract to which he is not a party." *Aberdeen Harbour Bd. v. Heating Enter. (Aberdeen) Ltd.*, 1990 S.L.T. 416, 422 **[*28]** (Ex. Div. 1989) (citation omitted); *see also Mercedes-Benz Fin. Ltd. v. Clydesdale Bank*, 1997 S.L.T. 905, 913 (O.H. 1996) ("*jus quaesitum tertio* is the exception, not the rule") (citation omitted). In essence, this court must consider whether the provision of the contract confers some benefit on the tertius, *i.e.*, third party, and whether it is evident that the contracting parties intended to give the tertius a title to sue upon the contractual provision at issue. *See Sears Prop. Netherlands BV v. Coal Pension Prop. Ltd.*, 2001 S.L.T. 761, 766 (O.H. 2000).

The terms of the Patent Licence Agreement do not confer a right to sue on sublicencees or subcontractors. In fact, Medline admits that no one from Maersk or Giltech informed Medline that it had a right to sue on the Patent Licence Agreement and that "the patent licence agreement does not explicitly allow third parties to sue either Maersk or Giltech for any violation of the third-party's rights." (Medline's Response to Giltech Limited's Rule 56.1 Statement, PP 201, 204). Medline also concedes that no one at Maersk informed it that through the Distribution Agreement Medline was becoming a party to the Giltech-Maersk **[*29]** contracts. (*Id.* at P 203). Finally, Medline admits that it has no rights to Giltech's technology or patents, the very subject of the Patent Licence Agreement. (*See* Medline's Response to Maersk's Additional Statement of Undisputed Facts, P 15).

Medline, however, cites to the frequency and detail of the references to third-parties in the Patent Licence Agreement in support of its argument that it was a third-party to the contract. These references primarily deal with the licencee's, *i.e.*, Maersk's, rights and obligations with respect to entering subcontracts and sublicences. In fact, the only right conferred upon sublicencees in the Patent Licence Agreement is the right to dispose of stocks of the licenced products and to complete binding contracts then in existence upon termination of the agreement. (*See* Maersk's Rule 56.1 Statement, Ex., 9, P 16.1).

In sum, the Patent Licence Agreement does not expressly state or imply Maersk's or Giltech's

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 26771 Page 14 of 18

Case 1:07-cv-07029    Document 18-5    Filed 03/27/2008    Page 14 of 18

intent that the contract somehow benefit Medline. Likewise, Medline has not established that the agreement confers the right to sue upon any third-parties, including Medline. Accordingly, any claim based on Medline's third-party **[*30]** rights to the Patent Licence Agreement must fail. This court grants Maersk's motion for summary judgment on Count III.

### E. Count IV -- Breach of Medline's Third-Party Rights Against Giltech

In Count IV, Medline alleges that Giltech breached its third-party rights under the Patent Licence Agreement. Because this court has determined that the Patent Licence Agreement does not express an intent to confer a right to sue upon third-parties, including Medline, the court grants Giltech's motion for summary judgment on Count IV of the Second Amended Complaint.

### F. Count V -- Fraudulent Inducement Against Maersk

In Count V, Medline alleges that Maersk fraudulently induced it to enter into the Distribution Agreement. <sup>HN17</sup>The elements of fraudulent inducement under English law, which this court has previously determined governs this claim, are: (1) misrepresentation of material fact; (2) made with knowledge that it is false and with the intent to induce the party to act upon it; (3) which is reasonably relied upon by the other party; and (4) as a result of which the party suffers injury. *See Morgan Guar. Trust Co. v. Republic of Palau*, 693 F. Supp. 1479, 1498 (S.D.N.Y. 1998) **[*31]** (citing *Bradford Third Equitable Bldg. Soc'y v. Borders*, [1941] 2 All. E.R. 205). Because of the serious nature of fraud allegations, the standard of proof that is applied under these circumstances is a high one. *See Hornal v. Neuberger Prods. Ltd.*, [1957] 1 QB 247, 266; *see, e.g., Vooght v. Hoath*, [2002] EWHC 1408 (Ch.D.).

Under the first element of fraudulent inducement, Medline must establish a misrepresentation of a material fact. At first, Medline contends that Maersk misrepresented that it has the exclusive right to market, sell, and distribute products employing Giltech technology within the North American market. However, Medline later argues that Maersk fraudulently misrepresented that it held the exclusive worldwide rights to the raw material necessary to manufacture the Arglaes "Products" under the Distribution Agreement. As discussed under Count II, the latter statement is the proper construction of the Distribution Agreement with "Products" being defined as the Arglaes trademarked products. Thus, Medline has not established a misrepresentation of material fact.

Next, Medline scoffs at Maersk's assertion that Maersk believes **[*32]** that its representations made in Section 3(a) of the Distribution Agreement are accurate statements of its supply agreements with Giltech, and thus Medline cannot establish that Maersk made a misrepresentation with the knowledge that it is false under the second element of fraudulent inducement. Maersk's assertion, however, is an accurate statement of English law; <sup>HN18</sup>"To prevent a false statement from being fraudulent, there must be an honest belief in its truth." *See Jaffray & Ors v. Society of Lloyd's*, [2002] EWCA Civ 1101 (C.A.) (citing *Derry v. Peek*, [1889] 14 App Cas 337, 374 (H.L.)). In any event, Medline offers no additional evidence or argument that Maersk's statement was made with the knowledge that it was false.

Because this court concludes that Medline has not established that Maersk made a misrepresentation of material fact and that Maersk knew such a statement was false, Medline has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *See Celotex*, 477 U.S. at 322. Thus, the court grants Maersk's motion for summary **[*33]** judgment on Count V.

### G. Count VI -- Fraudulent Misrepresentation Against Giltech

Next, Medline alleges that it entered into the Distribution Agreement based on assurances

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 2677

Case 1:07-cv-07029    Document 18-5    Filed 03/27/2008    Page 15 of 18

Page 15 of 18

made in a letter written by Giltech's solicitors and that the letter's representations were fraudulent. As previously discussed, Count VI is governed by Illinois law. *HN19* To establish a claim of fraudulent misrepresentation under Illinois law, a plaintiff must show the following elements by clear and convincing evidence: (1) a false statement of material fact; (2) defendant believed or knew the statement was false; (3) defendant intended to induce plaintiff to act; (4) plaintiff relied on the truth of the statement; and (5) plaintiff suffered an injury as a result of her reliance. *See Hoseman v. Weinschneider*, 322 F.3d 468, 476 (7th Cir. 2003) (citing *Cotter v. Parrish*, 166 Ill.App.3d 836, 117 Ill.Dec. 821, 520 N.E.2d 1172, 1175 (Ill.App.Ct. 1988)); *see also Schrager v. North Cmty. Bank*, 328 Ill.App.3d 696, 262 Ill.Dec. 916, 767 N.E.2d 376, 381-82 (Ill.App.Ct. 2002).

Article 21(d)(i) of the Distribution Agreement required Maersk to provide Medline with a written **[*34]** legal opinion from Giltech that the representations made by Maersk in Articles 3(a) and 3(b) of the Distribution Agreement were correct. Accordingly, during the Distribution Agreement negotiations, David Flint, Giltech's solicitor, sent a draft opinion letter to Maersk concerning the Giltech-Maersk supply and trademark licence agreements. After Maersk reviewed the letter for accuracy, a final draft was sent to Maersk who then provided Medline with the letter as required.

In the Second Amended Complaint, Medline alleges the following statement as false: "The Opinion Letter represents that 'Giltech have granted to Maersk Medical Limited ("MM") an exclusive supply agreement' which runs until '31 December 2013' and that 'MM may grant sub-licences.'" (Second. Am. Compl. P 67). In its memorandum to this court, however, Medline argues that the statement "Giltech have granted to [Maersk] an exclusive supply agreement whereby Giltech have agreed to supply only to [Maersk] Arglaes calcium phosphate glass and silver ("the Products") for use in wound management being management of wounds" is a false representation. Regardless of what part of the opinion letter Medline is ultimately challenging, **[*35]** Medline has failed to establish the first two elements of fraudulent misrepresentation under Illinois law, *i.e.*, that Giltech made a false statement of a material fact and that Giltech believed or knew the statement was false. *See Hoseman*, 322 F.3d at 476.

*HN20* Under Illinois law, an action for fraudulent misrepresentation requires that the maker of a representation, in this case Giltech's solicitor Flint, knew that the representation was false or that he made the representation with reckless disregard for its truth or falsity. *See id.* at 477. Here, nothing in the record indicates that Flint made a knowingly false statement of material fact in the letter. Not only did Flint testify that the statements in the letter were accurate when written, Maersk checked the letter for accuracy before giving it to Medline. More importantly, neither Medline's corporate deponent, president, nor outside counsel, all of whom negotiated the Distribution Agreement, could identify any false statement in Giltech's letter. (*See* Medline's Response to Giltech Limited's Rule 56.1 Statement, P 94). As such, Medline has not identified any portion of the letter which was not **[*36]** true when it was written, let alone that the alleged falsity of such a statement was deliberate. *See Stromberger v. 3M Co.*, 990 F.2d 974, 978 (7th Cir. 1993) *HN21* ("Fraud in the sense of deliberate deceit cannot be inferred from falsity alone").

Accordingly, Medline has not set forth enough facts from which a jury could find by clear and convincing evidence that Giltech knowingly made a false statement as required under Illinois law. Therefore, this court grants Giltech's motion for summary judgment as to Count VI of the Second Amended Complaint.

### H. Count VII -- Tortious Interference with Contract Against Giltech

In Count VII, Medline alleges tortious interference of contract, specifically the Distribution Agreement, against Giltech based on Maersk and Giltech's 1999 and 2000 Amendments to the Patent Licence Agreement. As discussed, this count is governed by Illinois law. *HN22* To

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 2677 Page 16 of 18

Case 1:07-cv-07029 Document 18-5 Filed 03/27/2008 Page 16 of 18

establish tortious interference with contract, a plaintiff must plead and prove the following elements: (1) the existence of a valid and enforceable contract; (2) defendant's awareness of the contractual relationship; (3) defendant's intentional and unjustified, *i.e.*, malicious, inducement **[*37]** of the breach of the contract; (4) a subsequent breach caused by defendant's wrongful conduct; and (5) damages. *See Voelker v. Porsche Cars N. Am., Inc.*, 353 F.3d 516, 527-28 (7th Cir. 2003) (citing *HPI Health Care Serv., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145, 137 Ill.Dec. 19, 545 N.E.2d 672, 676 (Ill. 1989)).

HN23 In the context of the third element for tortious interference with contract, a showing of ill will, hostility, or intent to injure is not required. *See Strosberg v. Brauvin Realty Servs., Inc.*, 295 Ill.App.3d 17, 229 Ill.Dec. 361, 691 N.E.2d 834, 845 (Ill.App.Ct. 1998). Instead, element three requires a showing that the defendant acted intentionally and without justification to induce the breach of contract. *See id.* ("A necessary prerequisite to the maintenance of an action for tortious interference with contract is a defendant's intentional and unjustified inducement of a breach of contract"); *see also HPI Health Care Serv.*, 545 N.E.2d at 677 (malicious means interference must be intentional and without justification).

Nevertheless, relying on the language of the Restatement (Second) of Torts, Section 766 **[*38]**, Medline argues that it does not have to establish that Giltech had any intent to induce a breach of contract because tortious interference can arise by simply inducing or causing a breach of contract. Section 766 of the Restatement provides:

> HN24 One who intentionally and improperly interferes with the performance of a contract between another and a third person by inducing or otherwise causing the third person to not perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Medline's reliance on this section of the Restatement is misplaced because it fails to reconcile the language "intentionally and improperly interferes" in its interpretation. In fact, comment h to Section 766 states: "this Section applies to any intentional causation whether by inducement or otherwise. The essential thing is the intent to cause the result. If the actor does not have this intent, his conduct does not subject him to liability under this rule even if it has the unintended effect of deterring the third person from dealing with the other." Accordingly, a showing of intent is required.

**[*39]** Furthermore, the Illinois Supreme Court, citing Section 766 of the Restatement, has clearly stated: HN25 "It is well established that one who intentionally and without justification induces another to breach his contract with a third party will be liable to the other for the pecuniary loss resulting from the failure of the third person to perform the contract." *Fellhauer v. City of Geneva*, 142 Ill.2d 495, 154 Ill.Dec. 649, 568 N.E.2d 870, 878 (Ill. 1991). Therefore, while it is true that Illinois law does not require a showing of ill will, hostility, or an intent to injure, Medline must establish that Giltech acted intentionally and without justification in inducing or causing a breach of contract. *See Strosberg*, 691 N.E.2d at 845.

Here, Giltech claims Medline has failed to present any evidence that Giltech intended to induce Maersk to breach the Distribution Agreement with Medline. Giltech also contends that the 1999 and 2000 Amendments to the Patent Licence Agreement were intended to provide Maersk with the rights necessary to fulfill its obligations to Medline under the Distribution Agreement. Medline, on the other hand, relies on its inaccurate legal **[*40]** interpretation of tortious interference by contending that because Giltech caused Maersk to breach the Distribution Agreement, Medline has established the elements of tortious interference with contract. As discussed, this alone is not enough to establish tortious interference with a contract - Medline must show that Giltech intentionally and without justification induced or caused Maersk to breach the Distribution Agreement. *See Fellhauer,* 568 N.E.2d at 878.

Medline does not point to the record or argue that Giltech intended, without justification, to induce Maersk to breach its contract with Medline as required under Illinois law. In fact, the record reveals that Medline admitted that it was unaware of any facts indicating that Giltech intended to harm Medline when it entered into the 1999 and 2000 Patent Licence Agreement Amendments. (*See* Medline's Response to Giltech Limited's Rule 56.1 Statement, P 145). Consequently, there is no genuine issue of material fact for trial as to element three.

Finally, because this court concluded under Section III, C. that Maersk did not breach the Distribution Agreement in the first instance, Medline cannot establish HN26 the **[*41]** fourth element of tortious interference of contract under Illinois law, *i.e.*, that a contract has been breached. *See Voelker,* 353 F.3d at 527. Therefore, the court grants Giltech's motion for summary judgment as to Count VII.

### I. Count VIII -- Tortious Interference with Contract Against Tyco

In the last count of the Second Amended Complaint, Medline alleges tortious interference of contract against Tyco based on Tyco's contracts with Giltech. Specifically, Medline argues that by entering into the 2001 and 2002 Agreements with Giltech: (1) Tyco induced Giltech to breach its agreement with Maersk in which Medline is a third-party beneficiary; (2) Tyco induced Maersk to breach its agreement with Giltech to which Medline is a third-party beneficiary; and (3) Tyco induced Maersk to breach the Distribution Agreement with Medline.

Because the court has previously determined that Medline has no third-party rights to the Patent Licence Agreement, the court need not decide Medline's first two claims. The court thus turns to Medline's claim that Tyco tortiously interfered with the Distribution Agreement causing Maersk to breach its agreement with Medline. As discussed **[*42]** above, under Illinois law, to establish a claim of tortious interference with contract Medline must prove: (1) the existence of a valid and enforceable contract; (2) defendant's awareness of the contractual relationship; (3) defendant's intentional and unjustified inducement of the breach of the contract; (4) a subsequent breach caused by defendant's wrongful conduct; and (5) damages. *See Voelker,* 353 F.3d at 527-28.

As with Giltech, Medline argues that it does not have to establish that Tyco intentionally induced a breach of contract because a claim of tortious interference can arise by simply inducing or causing a breach of contract. As discussed above, the court rejects Medline's legal interpretation of the requirements of tortious interference with contract under Illinois law. The court thus turns to whether Medline can establish that Tyco acted intentionally and without just cause in inducing or causing a breach of contract as required. *See Fellhauer,* 568 N.E.2d at 878.

Apart from the allegations in the Second Amended Complaint, there is no indication that Tyco intentionally, without justification, induced Maersk to breach the Distribution Agreement **[*43]** with Medline. Indeed, Medline does not point to the record in support of this argument. While HN27 it is not this court's duty to scour the record in search of evidence to defeat a motion for summary judgment, *see Ritchie v. Glidden Co.,* 242 F.3d 713, 723 (7th Cir. 2001), the court has carefully reviewed the record looking for any indication of Tyco's intent to induce a breach of contract to no avail.

Furthermore, this court has already concluded that Maersk did not breach the Distribution Agreement in the first instance. As such Medline cannot establish that fourth element of tortious interference of contract. *See Voelker,* 353 F.3d at 527. Because Medline has not set forth specific facts showing that a genuine issue for trial exists, *see Celotex,* 477 U.S. at 322, this court grants Tyco's motion for summary judgment as to Count VIII of the Second Amended Complaint.

### IV. CONCLUSION

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 2677  Page 18 of 18

Case 1:07-cv-07029   Document 18-5   Filed 03/27/2008   Page 18 of 18

For the foregoing reasons, the court denies Medline's motion for summary judgment as to Count I [R. 59-1]. The court grants Maersk's motion for summary judgment in its entirety [R. 78-1], Giltech's motion for summary judgment in its entirety [R. **[\*44]** 72-1], and Tyco's motion for summary judgment in its entirety [R. 53-1]. Because a determination of the parties' motions *in limine* is unnecessary to decide the substantive claims in this action, the court strikes the motions *in limine* as moot. [R. 105-1, 107-1, 107-2, 107-3, 107-4, 107-5, 107-6, 108-1, 108-2, 108-3, 108-4, 108-5, 109-1, 110-1, 111-1, 112-1, 113-1]. This court directs the clerk of the court to enter Rule 58 judgment and terminate this case from the court's docket.

ENTER:

**Blanche M. Manning**

**United States District Court Judge**

DATE: FEB 23 2004

**JUDGMENT IN A CIVIL CASE**

Decision by Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that the court denies Medline's motion for summary judgment as to count I [59-1]. The court grants Maersk's motion for summary judgment in it entirety [78-1], Giltech's motion fro summary judgment in its entirety [72-1], and Tyco's motion for summary judgment in its entirety [53-1].

Date: 2/23/2004

Service: **Get by LEXSEE®**
Citation: **2004 u.s. dist. lexis 2677**
   View: Full
Date/Time: Saturday, March 22, 2008 - 1:57 PM EDT

* Signal Legend:
- Warning: Negative treatment is indicated
- Questioned: Validity questioned by citing refs
- Caution: Possible negative treatment
- Positive treatment is indicated
- Citing Refs. With Analysis Available
- Citation information available

* Click on any *Shepard's* signal to *Shepardize®* that case.



About LexisNexis  |  Terms & Conditions  |  Contact Us
Copyright ©  2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.